IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA | ) | |
| | ) | CIVIL CASE NO. |
| Plaintiff, | ) | 1:23-CV-03792-SCJ |
| | ) | |
| v. | ) | **(Removed from the Superior Court of Fulton County, Criminal Action File No. 23SC188947)** |
| | ) | |
| SHAWN STILL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY OF DEFENDANT SHAWN STILL TO THE STATE OF GEORGIA'S RESPONSE TO HIS NOTICE OF REMOVAL

The State's Response completely ignores the Electoral Count Act ("ECA") and the legal precedent from Hawaii during the 1960 presidential election. Instead, the State attempts to bypass the law, stating that a "deep dive into the history and evolution of presidential electors" is "unnecessary" and that "there is no authority anywhere" supporting Defendant Shawn Still's actions. (ECF No. 8, pp. 14, 22, 24.) As discussed below, the State's Response flies in the face of not only the ECA but also the legal precedent established during the 1960 presidential election in Hawaii,

both of which expressly authorize Mr. Still's conduct as a contingent presidential elector on December 14, 2020, the only conduct for which Mr. Still is charged.[1]

## I. Mr. Still was Acting as a Federal Officer in his Capacity as a Contingent Presidential Elector when Engaged in the Charged Conduct.

The State advances two main arguments for why Mr. Still was not acting as a federal officer for purposes of 28 U.S.C. § 1442(a) removal: (1) the contingent elector role is a fiction; and (2) presidential electors—contingent or otherwise—are not federal officers. (ECF No. 8, pp. 10–15.) In making these arguments, however, the State attempts to rewrite the plain text of the ECA and ignores the near-identical precedent from the 1960 Hawaii presidential election. (*See id.* (containing no references to "Hawaii" and mentioning the "Electoral Count Act" once).) The State also fails to address the case law acknowledging (1) that presidential electors perform federal functions when meeting and casting ballots and (2) that the states have no authority to interfere with Congress' role in counting and adjudicating electoral ballots.

---

[1] The only factual allegations in the Indictment concerning Mr. Still are those related to this attendance at the December 14, 2020, contingent elector meeting. (ECF No. 1-1, pp. 41–43, 77, 79–82.)

### A. The State ignores the ECA and the Hawaii precedent when arguing that the contingent elector position is a fiction.

The State repeatedly—and mistakenly—asserts that Mr. Still was not a federal officer for purposes of Section 1442(a) removal because he was "impersonating" a presidential elector rather than performing any legitimate role. (*Id.* at pp. 4–6, 11–13.) The State's argument, however, is based on the incorrect assumption that a state governor's certification of the state's vote determines the state's presidential electors as a matter of law.

The U.S. Constitution vests in Congress *alone* the authority to receive, adjudicate, and count presidential elector ballots or returns. *See* U.S. Const. amend. XII. Pursuant to this authority, Congress enacted the ECA. 3 U.S.C. § 1 *et seq.*[2] Notably, the ECA expressly contemplates situations in which Congress receives multiple slates of presidential elector ballots from a state. *See* 3 U.S.C. § 15. Indeed, the ECA provides that Congress must open, present, and act upon "all the certificates and *papers purporting to be certificates* of the electoral votes." *Id.* (emphasis added). In short, the ECA establishes a three-step framework to address disputes

---

[2] Congress amended the ECA through the Electoral Count Reform and Presidential Transition Improvement Act of 2022, which went into effect on December 29, 2022. Therefore, the relevant version of the ECA applicable to this case is the pre-2022 version. As such, all citations to the ECA are to the prior version of the ECA.

regarding competing slates of presidential electoral ballots and determine which of the slates Congress must count:

(1) If the state's adjudicative body (*i.e.*, a court in a judicial contest) issues a final determination by the Safe Harbor Deadline[3] of any controversy or contest concerning which slate of ballots to count, then that determination is "conclusive" and "shall govern" when Congress counts the electoral votes.

(2) If the state's adjudicative body fails to issue a final determination as discussed in Step One, then both houses of the United States Congress must agree on which of the competing slates of ballots are the true ballots from the state. If the House and Senate agree on which slate of ballots is the true return from the state, then Congress must count the agreed-upon ballots.

(3) If the House and Senate fail to agree on which slate of ballots is the true return from the state as discussed in Step Two, then Congress must count the electoral ballots certified by the state's governor.

3 U.S.C. §§ 5, 6, 15.

In its Response, the State completely ignores the three-step framework established by the ECA. (*See* ECF No. 8.) Instead, the State's argument is based on the false premise—which it repeats without any supporting authority—that Governor Brian Kemp's certification of the vote on December 7, 2020, was a final, binding decision as to the presidential electors and that, therefore, Mr. Still was a

---

[3] As discussed in Mr. Still's Notice of Removal, the Safe Harbor Deadline is six days before the date the presidential electors must meet and cast their ballots. *See* 3 U.S.C. § 5. In the 2020 presidential election, the Safe Harbor Deadline was December 8, 2020.

"sham elector" and "never a certified or recognized presidential elector with any elector role to fulfill." (*Id.* at pp. 5, 11.) To quote the State, however, "[r]epeating a fiction does not make the statement true." (*Id.* at p. 12.)

The State also ignores the legal precedent from the 1960 election in Hawaii.[4] In that election, the Governor of Hawaii initially certified Republican candidate Richard Nixon as the winner of the state and sent that certification to Congress. Supporters of Democratic candidate John F. Kennedy filed a judicial contest to the election, alleging voting irregularities. That legal action was still pending at the time federal law mandated that Hawaii's presidential electors meet and cast their votes. Both the Republican nominees and the Democratic nominees met and cast their votes for their respective candidates. After both sets of presidential electors cast their ballots, the court determined that Kennedy prevailed in the election, and the election was re-certified in Kennedy's favor. Hawaii's Governor transmitted a second certification to Congress on behalf of the State stating that, as a result of the lawsuit, the electoral votes of Hawaii were to be recorded in favor of Kennedy. Congress ultimately counted the later-certified Kennedy ballots instead of the initially-certified Nixon ballots.

---

[4] The Complaint, Findings of Fact, Conclusions of Law, and Judgment from the Hawaii precedent are attached as Exhibit A.

Applying 1960 Hawaii to 2020 Georgia, the Safe Harbor Deadline was December 8, 2020. By that date, a lawsuit contesting the election remained pending in Fulton County Superior Court, meaning that a Georgia court had not issued a final decision by the Safe Harbor Deadline. *See Trump v. Raffensperger*, No. 2020CV343255. Therefore, at the time Mr. Still cast his ballot as a contingent presidential elector on December 14, 2020, in accordance with the Hawaii precedent, Step Two from above applied. As such, the House and Senate possessed the sole authority to adjudicate any dispute between competing presidential elector ballots.

While the State argues that "the Democratic slate had already filled [the] role" of presidential electors due to Governor Kemp's certification, (ECF No. 8, p. 11), the State ignores the fact that the certification had *no legally binding effect on Congress*. Rather, because no final judicial decision was issued in Georgia by the Safe Harbor Deadline, Congress *alone* had the authority to adjudicate which slate of ballots to count. As such, neither the Republican elector nominees nor the Democratic elector nominees were—or could claim to be—the "true" presidential electors, as a matter of law. Instead, both sets of nominees were contingent presidential electors on December 14, 2020, because Congress had not yet rendered a decision. Contrary to the State's assertion, Governor Kemp's certification on

December 7, 2020, of the Democratic slate of presidential electors had no legally binding effect on Congress.[5]

Finally, the State asserts that even if the election contest was successful, the "only lawful remedy that could be imposed by a court is a new election, not the 'flipping' of one slate of electors for another." (*Id.* at p. 7 n.1 (citing O.C.G.A. § 21-2-527(d)).) However, O.C.G.A. § 21-2-527(a) provides that a court, after "hearing the allegations and evidence," shall "declare as . . . elected . . . that qualified candidate who received the requisite number of votes and shall pronounce judgment accordingly." O.C.G.A. § 21-2-527(a).[6] Furthermore, Congress alone held the authority to adjudicate the presidential elector dispute, and a judicial decision issued after the Safe Harbor Deadline could help Congress resolve the dispute because (1) Congress could consider that decision (even though it was not bound by it) and decide to count the presidential elector ballots that the state court determined were

---

[5] Under the ECA, Governor Kemp's certification would only become relevant if, on January 6, the House and Senate could not agree as to which of the competing slates of ballots were the true ballots from Georgia (as shown in Step Three from above).

[6] Georgia law also provides that commissions may be issued to persons who appear to have been elected to office "notwithstanding the fact the election of such person may be contested" and makes such commissions contingent on the outcome of the judicial contest. O.C.G.A. § 21-2-503(a). The statute then provides that the declared winner of the election shall be issued a commission, which nullifies the commission already issued. *Id.*

valid, and (2) Governor Kemp could have re-certified the Republican elector nominees as the presidential electors from Georgia based on a court's favorable decision in the judicial contest, as the Hawaii Governor did in the 1960 election.

> **B.     Presidential electors are federal officials for purposes of federal officer removal under Section 1442(a).**

The State further argues that presidential electors—contingent or otherwise—are state officials for purposes of removal and, therefore, not entitled to federal officer removal. (ECF No. 8, pp. 13–15.)  However, in doing so, the State ignores the constitutional distinction between the *appointment* of presidential electors and the federal role presidential electors perform in *meeting and casting ballots*.

The U.S. Constitution creates presidential electors.  U.S. Const. art. II, § 1, cl. 2.  While the Constitution grants states the authority to set the manner in which presidential electors are *appointed*, the Constitution vests in Congress the sole authority to receive, adjudicate, and count ballots from presidential electors.  U.S. Const. amend. XII.  Furthermore, the Supreme Court has expressly recognized that presidential electors "exercise a federal function in *balloting* for President and Vice-President."  *Ray v. Blair*, 343 U.S. 214, 224 (1952) (emphasis added).  Indeed, the Twelfth Amendment "tells electors to meet in their States, to vote for President and Vice President separately, and to transmit the lists of all their votes to the President of the United States Senate for counting."  *Chiafalo v. Washington*, 140 S. Ct. 2316,

2324–25 (2020). Such conduct is an "exercise [of] federal functions under" and a "discharge of duties in virtue of authority conferred by[] the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934).

The exercise of a federal function in meeting and casting presidential electoral ballots is distinguishable from the authority states possess under the *Appointment* Power. Under the Appointment Power, states set the manner in which presidential electors are appointed. *See* U.S. Const. art. II, § 1, cl. 2 ("The Presidential Electors Clause"). However, that authority is limited to the specifically-delegated authority of *appointment*. *See U.S. Term Limits*, 514 U.S. 779, 804 (1995) ("[P]owers over the election of federal officers had to be delegated to, rather than reserved by, the States."). The Presidential Electors Clause is an "express delegation[] of power to the States to act with respect to federal elections." *Id.* at 805.

As such, the states do not have any power to regulate the conduct of presidential electors in balloting for President or to interfere with Congress' right or ability to receive, adjudicate, and count ballots and purported ballots from presidential electors. The only authority the states may exercise over presidential electors is the express authority granted to them by either the Constitution or Congress. The Constitution and Congress grant states such authority in only two limited ways: (1) set the manner of appointment for presidential electors, U.S. Const.

art. II, sec. 1, and (2) adjudicate disputes over presidential elector ballots on or prior to the Safe Harbor Deadline, 3 U.S.C. § 5.

The Government mistakenly relies on *Ray* and *Chiafalo* for the proposition that presidential electors are state rather than federal officers for purposes of removal under Section 1442. (ECF No. 8, pp. 13–14.) However, those cases stand for the mere proposition that States may require and enforce elector "pledges" to vote for certain candidates as a requirement for appointment pursuant to the specifically delegated *Appointment* Power. *Ray*, 343 U.S. at 231; *Chiafalo*, 140 S. Ct. at 2320. Though these cases state *in dicta* that presidential electors are not "federal officers or agents," these cases address the Appointment Power of the states and not the balloting power, which states do not possess. *See Ray*, 343 U.S. at 224 (presidential electors "exercise a federal function in *balloting* for President and Vice-President").

Moreover, these cases do not involve the broad application of federal officer removal. *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("The federal officer removal statute is not 'narrow' or 'limited.'"); *Florida v. Cohen*, 887 F.2d 1451, 1454 n.4 (11th Cir. 1989) (noting that courts should give a "broad reading" to Section 1442(a)(1)). Even assuming that Mr. Still acted as a state officer at the time he was appointed as a presidential elector nominee, he acted as a federal officer when he met and cast his ballot as a contingent presidential elector. Courts have held that

officers who hold both state and federal offices are entitled to removal under Section 1442(a)(1). *See Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1322 (N.D. Ga. 2022) (county sheriff's deputy entitled to federal officer removal because he was acting in his capacity as a U.S. Marshal during his involvement in the charged conduct); *Ohio v. Meade*, No. 2:21-cv-5587, 2022 WL 486294, at *3 (N.D. Ohio Feb. 17, 2022) (law enforcement officer who was both a Special Deputy U.S. Marshal and a county deputy sheriff qualified for federal officer removal). At minimum, Mr. Still—in his capacity as a presidential elector—was both a state and federal officer for purposes of Section 1442 removal and, as such, is still entitled to removal.

## II.     Mr. Still was Acting Under the Color of His Office.

The State argues that Mr. Still was not acting "under the color of office" because contingent electors "are no electors at all." (ECF No. 8, p. 18.) However, as discussed in Section I.A and B, *supra*, this position is unsustainable in the face of the ECA's plain language and the Hawaii precedent.

Furthermore, the Indictment only charges Mr. Still for meeting and casting his ballot as a contingent presidential elector on December 14, 2020, the date the law requires presidential electors to meet and cast ballots. (ECF No. 1-1, pp. 41–43, 77, 79–82.) Such conduct is exactly what the ECA and Twelfth Amendment require of presidential electors. *See* U.S. Const. amend. XII; 3 U.S.C. § 15.

Finally, the "hurdle erected by this requirement is quite low." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017). Section 1442(a)(1) provides that "removable claims must be 'for or relating to any act' under color of office." 28 U.S.C. § 1442(a)(1). The Eleventh Circuit interprets the phrase "relating to" broadly. *Caver*, 845 F.3d at 1144. Thus, Mr. Still, by meeting and casting his ballot on December 14, 2020, in accordance with the ECA and Hawaii precedent, was acting under the color of his office as a contingent presidential elector.

### III. Mr. Still has Colorable Federal Defenses.

#### A. Mr. Still possesses official immunity under the Supremacy Clause.

The State argues that Mr. Still does not have a "colorable federal defense" of immunity under the Supremacy Clause because (1) Mr. Still did not perform any federal duty as he was not a "duly elected and qualified" presidential elector and because presidential electors are state actors anyway, and (2) Mr. Still had a "personal interest" in performing his duty as a contingent presidential elector because he was "acting only to further Trump campaign litigation goals." (ECF No. 8, pp. 22–23.)

As an initial matter, a "colorable defense" for purposes of federal officer removal "need only be plausible." *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). The defense's "ultimate validity is not to be determined

at the time of removal." *Id.* Additionally, as explained above, the ECA expressly authorizes the role and duty of contingent presidential electors, and presidential electors—contingent or otherwise—perform a "federal function in *balloting* for President and Vice-President." *See* Section I.A and B, *supra* (quoting *Ray*, 343 U.S. at 224) (emphasis added). Thus, Mr. Still, as a contingent presidential elector on December 14, 2020, was performing an act (*i.e.*, meeting and casting a ballot) that "he was authorized to do by the law of the United States." *Denson v. United* States, 574 F.3d 1318, 1346 (11th Cir. 2009) (quoting *In re Neagle*, 135 U.S. 1, 75 (1890)).

The State further argues that even if Mr. Still was authorized by federal law to perform his duty as a contingent presidential elector, his authority is negated by evidence of "personal interest" because Mr. Still was "acting only to further Trump campaign litigation goals." (ECF No. 8, p. 22.) However, the case upon which the State relies, *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982), adjudicates the issue of official immunity on the merits, which—at the removal stage—is inappropriate to do. *Magnin*, 91 F.3d at 1427.[7]

---

[7] Even if the Court addressed the merits, the evidence shows that Mr. Still acted in good faith to perform his duty and not out of personal interest. Though Mr. Still acted to "preserve the integrity of the lawsuit," the lawsuit was filed to preserve and vindicate his rights as a contingent presidential elector. The lawsuit itself and the transcript of the December 14 meeting show that the electors acted at the direction of an attorney, in accordance with the Constitution and the Hawaii precedent, because of the "contest [of] the election of the [presidential] *electors* in Georgia."

13

Finally, the State argues that the Supremacy Clause defense does not apply because Mr. Still did more than was "necessary and proper" to carry out his role as a contingent presidential elector. (ECF No. 8, pp. 23–24.) According to the State, Mr. Still had no subjective or objective reason for meeting and casting his ballot as a contingent presidential elector because "there is no authority anywhere" to support his conduct. (*Id.* at p. 23.) As demonstrated herein, however, Mr. Still's conduct was expressly authorized by the Constitution, ECA, and Hawaii precedent. He met and cast his ballot based on the Constitution and Hawaii precedent, an attorney advised him that his conduct was in accordance with the Constitution and Hawaii precedent, and he was told that his vote was "the only way" for a judge to consider the election contest. (ECF No. 1-2, pp. 4, 8–9.) Therefore, Mr. Still subjectively believed his actions were appropriate in carrying out his duties as a contingent presidential elector, and that belief is objectively reasonable.[8]

---

(ECF No. 1-2, p. 8 (emphasis added); *see* ECF No. 1-3, pg. 52.) Thus, Mr. Still's "good faith cannot be seriously questioned" as he did not meet and cast his ballot "for any other reason than to do his duty as he saw it." *Baucom*, 677 F.2d at 1350.

[8] Notably, the State does not suggest an alternative to Mr. Still's conduct as to how the contingent presidential electors could fulfill their duty and preserve their rights. *See Baucom*, 677 F.2d at 1351 (officer's conduct was "necessary and proper" in part because "no better alternative [was] suggested to fit the circumstances of the case").

14

### B. The First Amendment protects Mr. Still's conduct.

Finally, the State appears to argue that the First Amendment "provides no protection" for Mr. Still's conduct because that conduct was criminal. (*See* ECF No. 8, p. 24.) However, as discussed above, the ECA forecloses such an argument, and any attempt to litigate the merits of Mr. Still's defense based upon the State's theory of the case is improper at this stage. *See Magnin*, 91 F.3d at 1427; *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999).

## CONCLUSION

For the foregoing reasons and the reasons set out in Defendant Shawn Still's Notice of Removal, this case is subject to removal pursuant to 28 U.S.C. §§ 1442(a) and 1455.

Respectfully submitted this 15th day of September, 2023.

>
> */s/ Thomas D. Bever*
> Thomas D. Bever
> Georgia Bar No. 055874
> W. Cole McFerren
> Georgia Bar No. 409248
> SMITH, GAMBRELL & RUSSELL, LLP
> 1105 W. Peachtree Street, N.E.
> Suite 1000
> Atlanta, GA 30309
> Telephone: (404) 815-3500
> tbever@sgrlaw.com
> cmcferren@sgrlaw.com
>
> *Counsel for Defendant Shawn Still*

15

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL CASE NO. |
| | ) | 1:23-CV-03792-SCJ |
| v. | ) | |
| | ) | **(Removed from the Superior Court** |
| SHAWN STILL | ) | **of Fulton County, Criminal Action** |
| | ) | **File No. 23SC188947)** |
| Defendant. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that on the date set forth below, a true and accurate copy of the foregoing, which has been prepared using 14-point Times New Roman font, was filed electronically with the clerk of the United States District Court for the Northern District of Georgia. Notice of this filing will be sent by operation of the Court's electronic filing system to all ECF-registered parties. Parties may access this filing through the Court's CM/ECF system.

This the 15th day of September, 2023.

/s/ *Thomas D. Bever*
Thomas D. Bever
Georgia Bar No. 055874
W. Cole McFerren

Georgia Bar No. 409248
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, N.E.
Suite 1000
Atlanta, GA 30309
Telephone: (404) 815-3500
tbever@sgrlaw.com
cmcferren@sgrlaw.com

*Counsel for Defendant Shawn Still*