[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13360

Non-Argument Calendar

_____

STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

DAVID JAMES SHAFER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03720-SCJ

_____

2                    Opinion of the Court                    23-13360

_____

No. 23-13361

Non-Argument Calendar

_____

STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

SHAWN MICAH TRESHER STILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03792-SCJ

_____

_____

No. 23-13362

Non-Argument Calendar

_____

STATE OF GEORGIA,

                                        Plaintiff-Appellee,

*versus*

CATHLEEN ALSTON LATHAM,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03803-SCJ

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and GRANT, Circuit Judges.

PER CURIAM:

In this consolidated appeal, David Shafer, Shawn Still, and Cathleen Latham, three members of a Republican-nominated slate of electors for the 2020 presidential election, appeal the orders remanding state criminal prosecutions against them for conspiring to interfere in the certification of that election. They argue that the district court erred in ruling that they were not entitled to remove their state criminal prosecutions to the district court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). Shafer

separately argues that the district court also erred in denying his request for pretrial habeas relief, *id.* § 2241. We affirm.

## I. BACKGROUND

In August 2023, a Fulton County grand jury returned an indictment charging former President Donald Trump, Shafer, Still, Latham, and fifteen other defendants with interfering in the 2020 presidential election. The indictment alleged that Shafer, Still, and Latham knowingly and willfully conspired to unlawfully change the outcome of the presidential election in Trump's favor by purporting to give Georgia's 16 electoral votes to him and issuing fraudulent elector certificates to state and federal officials during a sham elector meeting held after the governor of Georgia certified that President Joe Biden had prevailed. The indictment charged Shafer, Still, and Latham with violating the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c), and other state law crimes including impersonating a public officer, forgery in the first degree, criminal attempt to commit filing false documents, and false statements and writings, *id.* §§ 16-4-8, 16-9-1(b), 16-10-20, 16-10-23. The indictment also charged Latham with conspiring to defraud the state and to commit election fraud, computer theft, computer trespass, and computer invasion of privacy. *Id.* §§ 16-4-8, 16-9-93, 16-10-21, 21-2-566, 21-2-574, 21-2-603.

Shafer, Still, and Latham filed separate notices of removal in the district court, *see* 28 U.S.C. § 1455, based on federal-officer jurisdiction, *see id.* § 1442(a)(1). They argued that they were charged with conduct stemming directly from their service as "contingent

Republican Presidential Electors" acting with federal authority at the direction of Trump, counsel for his campaign, and federal officers. They also argued that they had federal defenses of official immunity, preemption, immunity under the Supremacy Clause, and defenses under the Due Process Clause and the First Amendment. Shafer's notice of removal included a "request for habeas or equitable relief," asserting that the district court could protect federal sovereignty from improper state criminal indictments through a writ of habeas corpus, *id*. § 2241, or injunctive or declaratory relief. The district court ordered a joint evidentiary hearing.

After the joint hearing, the district court remanded the criminal prosecutions to state court. The district court ruled, without the benefit of our decision in *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), that it lacked jurisdiction over the removal of the criminal prosecutions because the Republican-nominated electors were not federal officers under section 1442 and did not act under the direction of a federal officer. It declined to address whether the nominated electors had a colorable federal defense. The district court also abstained from considering Shafer's petition for a writ of habeas corpus. *See Younger v. Harris*, 401 U.S. 37 (1971). And it denied a certificate of appealability.

## II. STANDARDS OF REVIEW

Three standards govern. We review issues of removal jurisdiction *de novo*. *Meadows*, 88 F.4th at 1338. We review the availability of habeas relief under section 2241 *de novo*. *Dohrmann v. United States*, 442 F.3d 1279, 1280 (11th Cir. 2006). And we review an

abstention decision for abuse of discretion. *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that Shafer, Still, and Latham are not entitled to removal because, even if nominated electors could be federal officers under the removal statute, the statute does not apply to former officers. *See Meadows*, 88 F.4th at 1338. Second, we explain that we lack jurisdiction to consider Shafer's arguments regarding the denial of habeas relief absent a certificate of appealability, and we decline to issue one because reasonable jurists would not debate that the district court did not abuse its discretion by abstaining under *Younger*.

### A. Shafer, Still, and Latham Are Not Entitled to Federal-Officer Removal, 28 U.S.C. § 1442(a)(1).

Shafer, Still, and Latham argue that as nominated presidential electors for the 2020 election, they were federal officers acting pursuant to constitutional and federal authority and are entitled to remove. 28 U.S.C. § 1442(a)(1). We disagree.

The federal-officer removal statute, *id.*, "protects an officer of the United States from having to answer for his official conduct in a state court." *Meadows*, 88 F.4th at 1338. The statute "provides a right of removal to federal court if a defendant proves that he is a federal officer, his conduct underlying the suit was performed under color of federal office, and he has a 'colorable' federal defense." *Id.* And in *Meadows*, we explained that federal-officer removal under section 1442(a)(1) applies only to current federal officers. *See id.*

at 1335–38, 1350 (affirming the remand of the state criminal prose-
cution of Shafer, Still, and Latham's codefendant Mark Meadows
to state court because the federal-officer removal statute did not
apply to him as the former chief of staff and assistant to Trump).

We need not decide whether nominated presidential elec-
tors are federal officers. Even if Shafer, Still, and Latham were fed-
eral officers in 2020 when they were nominated to the Republican
slate of electors, they would not be *current* federal officers. *See id.* at
1338–41; *see also United States v. Chitwood*, 676 F.3d 971, 975 (11th
Cir. 2012) (We "may affirm for any reason supported by the record,
even if not relied upon by the district court." (internal quotation
marks omitted)). Shafer, Still, and Latham admit that they are, at
best, former officers but ask us to overrule *Meadows*. Yet *Meadows*
controls, and we are bound to follow it. *See United States v. Archer*,
531 F.3d 1347, 1352 (11th Cir. 2008) (A "prior panel's holding is
binding on all subsequent panels unless and until it is overruled or
undermined to the point of abrogation by the Supreme Court or
by this court sitting *en banc*."); *see also United States v. Lee*, 886 F.3d
1161, 1163 n.3 (11th Cir. 2018).

### B. Shafer Failed to Obtain a Certificate of Appealability or Establish Entitlement to a Certificate.

A state pretrial detainee may file a petition for a writ of ha-
beas corpus. 28 U.S.C. § 2241; *see Hughes v. Att'y Gen. of Fla.*, 377
F.3d 1258, 1261–62 (11th Cir. 2004). But when the petitioner's de-
tention "arises out of process issued by a State court," he must ob-
tain a certificate of appealability to appeal. 28 U.S.C.

8                    Opinion of the Court                    23-13360

§ 2253(c)(1)(A). To obtain a certificate, the petitioner must make "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). When the district court denies a habeas petition on procedural grounds without reaching the underlying constitutional claim, the petitioner must establish that reasonable jurists would find debatable both whether the petition states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

The parties dispute whether Shafer must obtain a certificate of appealability. Shafer did not address the matter in his initial brief but, after Georgia argued that we lack jurisdiction without a certificate of appealability, he argued in reply that a certificate is unnecessary because the district court declined to rule on the merits of his request, so there is no "final order" under section 2253(c). Shafer alternatively asked that we construe his brief as a request for a certificate of appealability.

We agree with Georgia. Shafer must obtain a certificate of appealability because he complains about a criminal proceeding against him that "arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1)(A); *see Medberry v. Crosby*, 351 F.3d 1049, 1063 (11th Cir. 2003); *Sawyer v. Holder*, 326 F.3d 1363, 1364 n.3 (11th Cir. 2003); *see also Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 300 (1984) (The "use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody."). And his argument that the order is not "final" under section

2253(c)(1)(A) because it did not reach his constitutional claims lacks merit. *See Slack*, 529 U.S. at 478 (providing the standard for issuing a certificate of appealability when the district court has denied a habeas petition on procedural grounds without reaching the constitutional claim).

We also reject Shafer's alternative request for a certificate of appealability because reasonable jurists would not debate that the district court did not abuse its discretion in abstaining from intervening in a state criminal proceeding. *See Younger*, 401 U.S. at 40–41, 45 (requiring district courts to abstain from interfering with pending state proceedings absent "extraordinary circumstances"); *Hughes*, 377 F.3d at 1262 ("When a petitioner seeks federal habeas relief prior to a pending state criminal trial the petitioner must satisfy the '*Younger* abstention hurdles' before the federal courts can grant such relief."). Shafer contends that *Younger* is inapplicable because his state indictment is preempted by federal law, but none of his arguments for federal preemption are "facially conclusive." *See Hughes*, 377 F.3d at 1265. The district court clearly did not abuse its discretion in abstaining based on *Younger*.

## IV. CONCLUSION

We **AFFIRM** the orders remanding these state criminal actions.

23-13360               ROSENBAUM, J., Concurring                    1

ROSENBAUM, Circuit Judge, Concurring:

A Georgia grand jury indicted Defendants David Shafer, Shawn Still, and Cathleen Latham on several charges, including conspiracy to interfere with the 2020 presidential election and falsely represent themselves as the state's lawful Electors. All this, the indictment alleges, Defendants did to try to tamper with the results of Georgia's election. Now Defendants seek to invoke the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), as a basis for removing their Georgia criminal case to federal court.

I agree with the Majority Opinion that Defendants—who assert they were "contingently elected presidential electors"—can't remove their Georgia criminal case to federal court because, under our precedent, the federal-officer removal statute doesn't apply to former federal officers, which Defendants claim to be. But Defendants' position fails for two even more fundamental reasons than that.

First, under the Constitution, federal law, and the laws of Georgia, Defendants were not 2020 presidential Electors, no matter the modifiers they add to the title. The people of Georgia did not vote for them to be Electors. Nor does the purported position of "contingently elected presidential elector" exist in the Constitution or federal or state law. And Defendants were no more presidential Electors simply because they give themselves the title than Martin Sheen was ever the President because he went by President Bartlet. *See generally The West Wing* (NBC television broadcast Sept. 22, 1999).

Second, even lawful presidential Electors are not officers of the United States under the federal-officer removal statute. States—not the federal government—directly appoint Electors. And Electors never assume functions on behalf of the whole United States. *See* U.S. CONST. amend. XII. In fact, the Constitution bars current officers of the United States from serving as Electors. U.S. CONST. art. II, § 1, cl. 2.

So Defendants' attempts under the federal-officer removal statute to remove the Georgia criminal charges against them are wrong three times over. Because the Majority Opinion already explains that the federal-officer removal statute doesn't apply to former federal officers, I focus my discussion on the other two reasons Defendants don't qualify as federal officers under the federal-officer removal statute. Section I explains that Defendants were never presidential Electors for the State of Georgia in the 2020 election. And Section II shows why even actual presidential Electors don't qualify as federal officers for purposes of the federal-officer removal statute.

## I.    Defendants were never presidential Electors for the State of Georgia in the 2020 election.

Defendants can't remove their case as 2020 presidential Electors because they weren't 2020 presidential Electors. Under the Constitution, state law determines how Electors are to be appointed. *Id.* The State of Georgia chose to appoint Electors by popular vote, and the people of Georgia did not vote for Defendants.

### A. *State law governs the process for appointing Electors.*

I begin with a discussion of how Electors are appointed.  As this section shows, the Constitution expressly assigns the role of determining how Electors shall be appointed to the states—not the federal government.  In contrast, the Constitution gives the federal government only a limited role in the appointment process:  the federal government gets to decide when the Electors shall be appointed.  But even that comes with important caveats.  The Constitution expressly prohibits Representatives, Senators, and federal officers, most of whom report to the President, from serving as Electors.  U.S. CONST. art. II, § 1, cl. 2.  The idea is to prevent corruption of the process.  To show how this works, this section gets into the nitty-gritty of the Constitution's design for appointment of Electors.

I begin with the 10,000-foot view.  The United States holds no national popular elections.  True, the President is an elected official who represents the whole nation.  But the Constitution prescribes that 51 individual contests to appoint Electors occur in each of the 50 states and the District of Columbia to determine who the President is.  *Id.*, amend. XXIII.

With that in mind, we consider what the Constitution has to say about appointing Electors.  Article II, Section 1, Clause 2, of the Constitution spells out the first step in the process for electing the President.  It provides, "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . .

. . ."[1]  *Id.* art. II, § 1, cl. 2.  The implications of this section are clear: state law determines how presidential Electors are chosen.  *See Moore v. Harper*, 600 U.S. 1, 27 (2023) (explaining that "in choosing Presidential electors, the [Constitution] 'leaves it to the [state] legislature exclusively to define the method of effecting the object.'" (quoting *McPherson v. Blacker*, 146 U.S. 1, 27 (1892)).  And once a state's selected "Manner" for determining Electors has been executed, its Electors are appointed.  No further steps are necessary.

Today, "[w]ith two partial exceptions,[2] every State appoints a slate of electors selected by the political party whose candidate has won the State's popular vote."  *Chiafalo v. Washington*, 591 U.S. 578, 581 (2020).  States that choose to appoint Electors by election "are responsible for enacting 'a complete code for . . . elections,' including 'regulations relat[ing] to . . . prevention of fraud and corrupt practices [and] counting of votes.'"  *Georgia v. Meadows*, 88 F.4th 1331, 1346 (2023) (alterations in original) (quoting *Moore*, 600 U.S. at 29).

---

[1] The Supreme Court has recognized that the term "Legislature" in the Electors Clause (and related Elections Clause) refers to a state's "lawmaking body created and bound by its state constitution."  *Moore v. Harper*, 600 U.S. 1, 27–28 (2023).  State courts can enforce the state constitution against state legislatures.  *See id.* at 22.

[2] Citizens of Maine and Nebraska vote for Presidential Electors within their congressional districts.  Each state awards one electoral vote per district and its two leftover electoral votes go to the winner of the statewide popular vote.  *See* ME. STAT. tit. 21-A § 802 (2024); NEB. REV. STAT. § 32-710 (2024).

23-13360            ROSENBAUM, J., Concurring            5

States may "compel electors to pledge in advance to support the nominee" of the party that nominated them to be electors. *Chiafalo*, 591 U.S. at 581. Most states today do just that. *Id*. And states may "penalize an elector for breaking his pledge and voting for someone other than the presidential candidate who won his State's popular vote." *Id*.

Congress's role in appointing Electors is small by contrast. Article II, Section 1, Clause 4, directs, "Congress may determine the Time of chusing the Electors . . . ." U.S. CONST. art. II, § 1, cl. 4. Because the President serves only a four-year term, Electors must be chosen once every four years. *See id*. cl. 1. Congress enjoys the power to ensure the process for appointing Electors occurs promptly.

Article II, Section 1, Clause 4, also allows Congress to set a final date for appointing Electors, so no State, dissatisfied with the voters' choice, can alter its process after Electors have been appointed. And Congress has done just that, requiring that "electors . . . be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day."[3] 3 U.S.C. § 1.[4]

---

[3] Using its authority under Article II, Section 1, Clause 4, and the Elections Clause, U.S. CONST. art. I, § 4, cl. 1., Congress has set election day by statute as "[t]he Tuesday next after the 1st Monday in November . . . ." 2 U.S.C. § 7.

[4] The Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, 136 Stat. 5233, amended this provision of the United States Code. At the time of Defendants' conduct, it read, "The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding

Despite this authority over the "Time" that presidential Electors are chosen, Congress has no power to regulate the "Manner" of appointing Electors. *See* U.S. CONST. art. II, § 1. This limitation contrasts with Congress's supervisory authority over congressional elections. *See id.* art. I, § 4, cl. 1.

Similar to the appointment of presidential Electors, by default, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." *Id.* But unlike with the appointment of presidential Electors, Congress has the power to "make or alter such Regulations, except as to the Places of chusing Senators." *Id.* That regulatory authority extends to the "Manner" of congressional elections. In contrast, no such power exists over the appointment of presidential Electors.

Relatedly, in an anti-corruption measure, the Constitution bars Representatives and Senators (as well as federal officers, most of whom report to the President) from serving as Electors. *Id.* art. II, § 1, cl. 2. As Hamilton explained in Federalist No. 68, federal officials "might be suspected of too great devotion to the President in office." In crafting this prohibition, the Framers drew from experience with English monarchs, who "traditionally manipulated members of Commons via patronage and financial preferment . . . ." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 154 (2005) [hereinafter AMERICA'S CONSTITUTION]. The Framers were

---

every election of a President and Vice President." Act of June 25, 1948, ch. 644, 62 Stat. 672, *repealed by id.*

concerned that presidential incumbents could similarly stack the odds in their favor by pressuring Congressmen serving as Electors. *Id.*

By ceding control of the appointment process to the states rather than Congress, the Founders thought it more likely that the people would vote on presidential Electors. In Federalist No. 68, Publius spoke repeatedly of the popular vote for Electors. *Id.* at 154–55. And James Wilson said that "[w]ith the approbation of the state legislatures, the people may elect [the President] with only one remove." *Id.* at 155 (quoting 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 512 (Jonathan Elliot ed., 1888) [hereinafter ELLIOT'S DEBATES]). For his part, Madison told Virginians that "the people choose the electors." *Id.* (quoting 3 ELLIOT'S DEBATES, *supra*, at 494).

As our nation's history progressed, Americans realized that some states, on unjust grounds, were depriving their citizens of the right to vote. So we amended the Constitution to recognize certain criteria on which the right to vote could not be restricted or denied. *See, e.g.*, U.S. CONST. amends. XIV, § 1 (prohibiting denial of the privileges or immunities of citizenship and requiring due process and equal protection of the laws), XV, § 1 (prohibiting denial on account of race), XIX (prohibiting denial based on sex), XXIV, § 1 (prohibiting denial because of failure to pay a tax), XXVI, § 1 (prohibiting denial on account of age to anyone at least 18 years old). And the Constitution empowered Congress to enact legislation to

8                     ROSENBAUM, J., Concurring                     23-13360

protect these rights. *See, e.g.*, amends. XIV, § 5, XV, § 2, XIX, XXIV, § 2, XXVI, § 2. But unless in service of these protections, Congress generally cannot otherwise interfere with the mechanisms that states choose to appoint their Electors.[5]

---

[5] To be sure, in *Oregon v. Mitchell*, 400 U.S. 112 (1970), Justice Black opined that Congress had broad regulatory authority over the appointment of Electors. *Id*. at 124 & n.7 (opinion of Black, J.) ("It cannot be seriously contended that Congress has less power over the conduct of presidential elections than it has over congressional elections.") (citing *Burroughs v. United States*, 290 U.S. 534 (1934)). But that view, which runs counter to the text, structure, and history of the Constitution, did not receive any traction from the rest of the Court then. *See id*. at 135 (Douglas, J., concurring in part and dissenting in part) ("I dissent from the judgments of the Court insofar as they declare § 302 of the Voting Rights Act unconstitutional as applied to state elections and concur in the judgments as they affect federal elections, but for different reasons. I rely on the Equal Protection Clause and on the Privileges and Immunities Clause of the Fourteenth Amendment.") (internal citation omitted); *id*. at 231 (Brennan, J., concurring in part and dissenting in part) ("congressional power to enact the challenged Amendments is found in the enforcement clauses of the Fourteenth and Fifteenth Amendments."); *id*. at 212 (Harlan, J., concurring in part and dissenting in part) ("Any shadow of a justification for congressional power with respect to congressional elections therefore disappears utterly in presidential elections."); *id*. at 285-86. (Stewart, J., concurring in part and dissenting in part) (relying on the power to protect the privileges or immunities of citizenship to uphold a congressional regulation of residency requirements for voting in presidential elections). Nor has it since. *Cf. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 n.8 (2013) (concluding *Mitchell*, "which lacked a majority rationale, is of minimal precedential value" and rejecting Justice Black's view of Congress's authority to set qualifications for federal elections). After all, "Article II, § 1 's appointments power gives the States far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo*, 591 U.S. at 588-89.

In sum, then, the Constitution empowers states, and only states, to determine the "Manner" by which Electors are appointed. Once a state's chosen process is completed, at the "Time" set by Congress, the Electors are appointed.

### B. Defendants were not appointed Electors under Georgia law.

Every state allows its citizens to vote for the Electors that it appoints. Georgia is no exception. *See* GA. CODE ANN. § 21-2-10 (2024) (providing for popular vote for presidential Electors). In this section, I first explain how Georgia's process for appointing presidential Electors works under Georgia law. Then I review what the record shows about Georgia's appointment of presidential Electors in the 2020 election.

### i. Georgia's Process for Appointing Presidential Electors

To facilitate the process for appointing presidential Electors, the political parties each nominate a set of Electors to be appointed if their party's presidential nominee receives the most votes for President in Georgia. *See id.* § 21-2-130(3) (providing for ballot qualification for candidates for presidential Electors); *id.* § 21-2-153(f) (prescribing the time and place for Presidential Elector qualification). Georgia voters then go to the ballot box and select whom they want to serve as President and Vice President. With their votes for the nominees, Georgia's voters select which party's Electors the State will appoint.

10                    ROSENBAUM, J., Concurring              23-13360

Before the election, the individuals the parties submit to be Electors hold no formal office under Georgia law. Instead, they are seeking for the State of Georgia to appoint them to an office, if their party's presidential nominee is elected. Just as a candidate is not the governor unless the people elect her, these individuals are not Electors unless the voters choose the proposed Electors' candidate. They are effectively job applicants who have yet to get the position.

Once votes are in, local superintendents count the ballots to tabulate the results. *See id.* § 21-2-493 (superseding § 21-2-493 (2019)). Today, Georgia also provides for an audit of the initial results to reduce the risk of error in the count, following a pilot program for the 2020 election. *Id.* § 21-2-498 (2024) (superseding § 21-2-498(e) (2019)). For this audit, Georgia officials use "statistical methods" to recount some or all the ballots by hand to be confident the results are accurate. *See id.*

In the vote-counting phase, the Georgia Secretary of State, the state's chief election official, must "tabulate, compute, and canvass the votes for each slate of presidential electors" and certify the results of the election "[n]ot later than 5:00 P.M. on the seventeenth day following the date on which such election was conducted." *Id.* § 21-2-499(b) (2024). By the same time, he must also "lay the returns for presidential electors before the Governor." *Id.* Then, the Governor must "enumerate and ascertain the number of votes for each [slate of presidential Electors] and certify the slates of presidential electors receiving the highest number of votes . . . . no later

23-13360                ROSENBAUM, J., Concurring                11

than 5:00 P.M. on the eighteenth day following the date on which such election was conducted." *Id.*

Once the Governor has certified the slate of presidential Electors, the Governor must "cause a certificate of election to be delivered to each person so chosen[]" to be appointed an Elector by the State. *Id.* § 21-2-502(e). With this step, the Electors have been recognized as appointed by the voters. And the process is complete.

But sometimes elections can be close. So when the certified margin of victory is less than one-half of one percent, the presidential campaigns may request a recount. *Id.* § 21-2-495(c)(1). Once the recount is completed, the Secretary of State and Governor of Georgia must once again certify the results of the election. *See id.* When they do so, that reconfirms the appointment (or in the event of a change in result, corrects the initial mistake and recognizes the rightful appointees). *See id.*

Georgia law also clarifies the status of certified presidential Electors if their candidate's election is contested in the state's courts. Under Georgia law, a candidate for office may contest the certified results of the election in the state courts. *Id.* § 21-2-521. But a lawsuit does not prevent an elected official from assuming office. Rather, the certified presidential Electors "may be sworn into office notwithstanding that the election . . . may be contested." *Id.* § 21-2-503(c). And only if there's a "final judgment of the proper tribunal . . . which orders a second election or declares that another

12          ROSENBAUM, J., Concurring          23-13360

person was legally elected to the office" do the originally certified
Electors "cease to hold the office . . . ." *Id.*

To summarize then, the certified presidential Electors are
the Electors even if they're contested.  And they remain the law-
fully appointed Electors unless a state court with jurisdiction issues
a final judgment that says otherwise.  Unless that happens, the con-
tested Electors hold no office under Georgia law.  Defendants do
not cite, and I am not aware of, any provision of Georgia law that
provides for the position of "contingently elected presidential elec-
tor."

        ii.    <u>Georgia did not appoint Defendants as presi-
dential Electors in the 2020 presidential elec-
tion.</u>

All these steps together compose the "Manner" Georgia has
selected for the appointment of its Electors.  And as I explain below,
the record shows that in the 2020 presidential Election, executing
its chosen "Manner," Georgia did not appoint Defendants as Elec-
tors.

To be sure, in the fall of 2020, the Republican party nomi-
nated Defendants to be appointed Electors *if* their nominee, Don-
ald Trump, received the most votes in Georgia.  But that did not
happen.

Voters went to the ballot box on November 3, 2020.  At the
close of the polls, Georgia election officials conducted an initial
count of the ballots and an audit, performed as a statewide hand

23-13360          ROSENBAUM, J., Concurring          13

recount of all ballots, that Secretary of State Brad Raffensperger ordered.

After these two counts, the Secretary of State ascertained that Joe Biden had received the most votes for President in Georgia by a margin of more than 10,000 votes. So Secretary Raffensperger certified the election results.

Secretary Raffensperger then gave the results to Georgia Governor Brian Kemp. On November 20, Governor Kemp independently ascertained and certified that Biden had received the most votes in that year's election. So Governor Kemp issued a certificate of ascertainment of the 16 Electors for the State of Georgia.

But because the certified results showed that Biden had won by a margin of less than half a percentage point, the Trump campaign had the right to request a recount of the results. *Id.* § 21-2-493(c)(1). The Trump campaign did so, and Secretary Raffensperger ordered a third count of the ballots.

This final recount of the ballots confirmed that Biden had received the most votes for President in Georgia by a margin of 11,779 votes. Secretary Raffensperger recertified the election and again laid the results before Governor Kemp.

On December 7, 2020, Governor Kemp, for a second time, ascertained Biden had received the most votes for President and certified the election. Under federal law at the time, Governor Kemp sent the amended and recertified certificate of ascertainment to the Archivist of the United States. As the certificate recognized, the voters of Georgia had appointed its slate of Electors.

Defendants were not among them.  So Defendants continued to occupy no office under federal or state law.

On December 4, 2020, Trump and Shafer (in his capacity as a nominated Elector and voter) sued in the Superior Court of Fulton County contesting the results of the election.  On December 9, the Superior Court issued an order stating that it would consider the case "in the normal course."  Trump and Shafer then filed an emergency petition with the Georgia Supreme Court, seeking a timelier adjudication before the Electors were scheduled to cast their ballots.  The Georgia Supreme Court denied that petition.

This lawsuit did not alter the appointment of the Democratic slate of Electors.  Under Georgia law, Secretary Raffensperger and Governor Kemp's lawful certification of the results remained standing despite the pending lawsuit.  *See id.* § 21-2-503(c).  Nor did the lawsuit change Defendants' status.  They remained private citizens because the governor lawfully certified the Democratic slate of Electors, and at no point did a final judgment show that Defendants were the lawfully appointed Electors.

In short, Georgia never appointed Defendants Electors.

### C.  Congress did not adjudicate Defendants as Georgia's Electors.

Congress also did not adjudicate Defendants as Georgia's Electors.  To explain why, I begin by describing Congress's role in dealing with Electors after the states have certified their Electors.  Then I show how the process worked in this case.

23-13360                 ROSENBAUM, J., Concurring                 15

      i.     <u>Congress's Role in Dealing With Electors</u>

After the Electors have been appointed by the states, Congress's role in the election of the President increases. The Twelfth Amendment spells out the rest of the process leading to the President's election. That process includes several steps.

First, "[t]he Electors shall meet in their respective states and vote by ballot for President . . . ."[6] U.S. CONST. amend. XII. Second, after the Electors cast their votes, each state's Electors tally their state's votes. Or in Twelfth Amendment-speak, the Electors "make distinct lists of all persons voted for as President . . . and of the number of votes for each." *Id.* Third, the Electors take these lists, and "sign and certify" them. *Id.* Fourth, the Electors send their "sealed" lists to the nation's capital and "direct[] [them] to the" Vice President. *Id.* Fifth, the Vice President, "in the presence of the Senate and House of Representatives, open[s] all the certificates and the votes shall then be counted."[7] *Id.* If an individual receives a majority of the electoral votes available for President, that person becomes President. *Id.*

---

[6] Congress may select "the Day on which [the Electors] shall give their Votes; which Day shall be the same throughout the United States." U.S. CONST. art. II, § 1, cl. 4. It has set that date as "the first Tuesday after the second Wednesday in December next following their appointment at such place in each State in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 7.

[7] As Congress has recognized, the Vice President performs only a ministerial role when opening the ballots. 3 U.S.C. § 15(b)(1) & (2).

16                    ROSENBAUM, J., Concurring                    23-13360

So what precisely is Congress's role in this process?  Over the last two centuries, the Vice President has, at times, received purported electoral votes of disputed legality.  Faced with these disputes, Congress has established the precedent, now long accepted, that when electoral votes are counted, Congress assesses challenges to their validity.

Take the Election of 1864.  There, the secessionist states of Louisiana and Tennessee, undergoing Reconstruction, purported to appoint Electors.  *See* AMERICA'S CONSTITUTION, *supra*, at 378. Congress refused to count any votes from those states.  *Id.*; Joint Resolution of Feb. 8, 1865, 13 Stat. 567.  It concluded that Louisiana and Tennessee were not readmitted states to the Union that could constitutionally appoint electors.  *Id.*

Or consider 1872.  After the appointment of Electors but before the Electors voted, the presumed runner-up, Horace Greeley, died.  Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap*, 48 ARK. L. REV. 215, 218 (1995). Still, three Electors voted for him when the Electors convened.  *Id.* Congress refused to accept or count the three electoral votes for the deceased Greeley.  *Id.*  Not surprisingly, a deceased man is constitutionally ineligible to serve as President.  So Congress concluded those votes were constitutionally invalid.[8]  *See id.*

---

[8] Congress could similarly treat votes for living disqualified candidates.  *See* U.S. CONST. art. II, § 1, cl. 5 (requiring the President be a natural-born citizen, 35 years old, and a resident of the United States for fourteen years), amends. XIV, § 3 (barring officials who swore an oath to the Constitution but engaged

And perhaps most famously, in the Election of 1876, the states of Florida, Louisiana, South Carolina, and Oregon sent the President of the Senate two sets of electoral votes. *See* Joseph R. Wyatt II, *The Lessons of the Hayes-Tilden Election Controversy: Some Suggestions for Electoral College Reform*, 8 RUTGERS-CAM. L.J. 617, 639 (1977). Congress had to adjudicate between competing slates of electoral votes that both claimed to be from the state's lawfully appointed Electors. To address those disputes, Congress created the Hayes-Tilden Commission to investigate and resolve which slates of Electors were legitimate. *See id.* at 641–43. The Commission resolved all disputes for the Republican slate of electors, and Congress accepted those electoral votes accordingly. *See id.* at 643–65. The Republican nominee, Rutherford B. Hayes, became our nineteenth President by just one electoral vote. *See id.* at 638–39.

In the wake of the election of 1876, Congress enacted the Electoral Count Act, Pub. L. No. 45-90, 24 Stat. 373 (Feb. 3, 1887), to govern the adjudicatory process. Assessing its responsibilities under the Twelfth Amendment, "Congress considered '[t]he power to judge of the legality of the votes [to be] a necessary consequent of the power to count.'" *United States v. Brock*, 94 F.4th 39, 56 n.6 (D.C. Cir. 2024) (alterations in original) (quoting 18 Cong. Rec. 30 (1886) (statement of Rep. Caldwell)). Put simply, Congress realized that, to properly tally the electoral votes, it needed to determine

---

in insurrection or rebellion against it from serving as President), XXII, § 1 (barring election to the presidency more than twice and serving for more than 10 years total).

18          ROSENBAUM, J., Concurring          23-13360

whether the returns it received were legitimate.[9]  And that required Congress to evaluate whether the appointment and voting of alleged Electors complied with the Constitution and state law.

The version of the Electoral Count Act that governed in 2020 has since been amended.  *See* Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, 136 Stat. 5233.  But in 2020, it provided that in the event of a dispute about the lawful Electors, Congress would treat as "conclusive" a "final determination" of the lawful Electors by state authorities "by judicial or other methods or procedures," if state authorities made their "final determination" by "at least six days before the time fixed for the meeting of electors."  Act of June 25,

---

[9] The Supreme Court has explained that "[a] controversy is nonjusticiable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department . . . .'"  *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1982)).  The Twelfth Amendment commits to Congress status as the proper forum for electoral votes to be "counted."  Because an accurate count necessarily requires assessing whether a vote should be included in it, Congress has the exclusive authority to judge the legal validity of electoral votes.  Still, this responsibility does not authorize Congress to intentionally reject votes to knowingly create an inaccurate count.  If Congress were to clearly reject a vote on grounds unrelated to the vote's validity, that action may be judicially reviewable as outside Congress's "textually demonstrable constitutional commitment."  *Cf. Powell v. McCormack*, 395 U.S. 486, 521–22 (1969) (concluding that Article I, Section 5's commitment to Congress of the responsibility to "Judge the Qualifications of its own Members" did not extend to excluding a member on grounds other than the constitutionally prescribed "Qualifications").

1948, ch. 644, 62 Stat. 673 (amended 2022).  This is called the "safe-harbor" deadline.

In 2020, the safe-harbor deadline fell on December 8.  The states' "final determination[s]" were to be transmitted to the Archivist of the United States by a certificate of ascertainment.  Act of Oct. 19, 1984, Pub. L. No. 98-497, 98 Stat. 2291.  If a state failed to finalize its Electors by the safe-harbor deadline, under the Electoral Count Act in effect at the time, Congress, by a majority vote of both Houses, would independently adjudicate who the lawful presidential Electors were.[10]  *Id.* at 675.

ii.    <u>Congress did not count Defendants as Electors in the 2020 Election.</u>

As I've noted, in connection with the presidential election of 2020, and under this process, Georgia certified its determinations

---

[10] Even with the "safe harbor," Congress retained authority to reject votes from Electors that a state fraudulently or otherwise unlawfully ascertained and certified.  Under the Electoral Count Act, a "final determination" would be "conclusive" for Congress only if the "determination" were made with the procedure provided by "laws enacted prior to the day fixed for the appointment of the electors."  62 Stat. at 673; *see also id.* at 675.  In plain English, there was no safe harbor for a state who certified its Electors by violating the procedure state law required as it existed on election day.  For example, if a state didn't properly count its votes under state law but certified its Electors anyway, that state would have no safe harbor.  Similarly, if two parts of state government disagreed on who had authority to make the final determination, there would be no safe harbor.  *See id.* at 675.  But the record contains no evidence that Georgia fraudulently or otherwise unlawfully ascertained or certified its results in 2020.

of its Electors, and Defendants were not among them.  After that happened, Defendants sued on December 4, 2020.  Because they sued ten days before the electoral college convened, with just four days until the safe-harbor deadline, they claim Georgia never reached a final determination of who its Electors were.  In other words, Defendants assert that Georgia had not legally appointed Electors as of the time Congress met to count the electoral votes. And because Defendants sent papers purporting to be lawful electoral votes to Congress, in competition with the actually appointed Electors, Defendants claim they were "contingently elected presidential electors."

But that's just not how Electors are appointed under our Constitution or our laws.  As I've mentioned, Georgia made a "final determination" under the Electoral Count Act that was conclusive for Congress's adjudication.  Under that Act, Georgia could make its final determination "by judicial *or other methods or procedures*," as long as it finished six days before the Electors were scheduled to meet.[11]  62 Stat. at 673 (emphasis added).

That Georgia did.  Secretary Raffensperger and Governor Kemp twice certified the results of the Election.  They used a lawful procedure Georgia adopted for a final determination, reaching that

---

[11] Defendants repeatedly claim that this provision under the Electoral Count Act required a "final judicial decision," but they overlook that the statute provides disjunctive methods for determining the Electors.  Act of June 25, 1948, ch. 644, 62 Stat. 673. (amended 2022) (requiring states to determine Electors "by judicial *or other methods or procedures*") (emphasis added).

23-13360          ROSENBAUM, J., Concurring          21

final determination on December 7, 2020.[12]  And Governor Kemp sent the Archivist of the United States the requisite certificate of ascertainment under the statute.  *See* 98 Stat. at 2291.  Because Georgia certified its Electors before December 8, 2020 (the safe-harbor deadline), Georgia's certification of its Electors was "conclusive" under the Electoral Count Act.

Congress then accepted the votes of Georgia's lawfully appointed and certified Electors.  And those did not include Defendants.  Put another way, Congress effectively made an adjudicatory determination that Defendants were not 2020 Electors for the State of Georgia.  What's more, the term "contingently elected presidential electors" never even existed in the Electoral Count Act.

---

[12] Defendants note that when the safe-harbor deadline of the Electoral Count Act is not met, Congress independently adjudicates the lawful Electors.  And when both Houses of Congress can't agree on the lawful Electors, the Governor's certification is the binding tiebreaker.  *See* 62 Stat. at 675.  They assert that that fact somehow makes the Georgia Governor's certification of Electors on December 7, 2020, not a final decision that is "conclusive" under the safe harbor.  In Defendants' view, if a lawsuit challenging the certification is pending, as it was here, the safe-harbor deadline is not met, and the Governor's certification is irrelevant until the tiebreaker scenario.  That's not the case.  As I've explained, Georgia's chosen procedure for finally ascertaining its Electors ends with the Governor's certification.  That certification remains in force unless a final judgment of a state court invalidates it.  *See* GA. CODE ANN. § 21-2-503(c) (2024).  That never happened in the 2020 election.  The mere filing of a lawsuit does not make a final decision any less final.  Indeed, if that were the case, anyone could prevent a state's final determination from being "final" under the provision, just by filing a lawsuit.

To be sure, Trump and Shafer had a pending lawsuit challenging the results of the election in Georgia state court when the second certification occurred.  But the plain text of the Electoral Count Act did not require Georgia's final decision on its Electors to be a "judicial" decision.  *See* 62 Stat. at 673.  To the contrary, the unsupportable reading Defendants urge would make the Electoral Count Act ineffective.  *See United States v. Powers*, 307 U.S. 214, 217 (1939) (noting a "presumption against a construction which would render a statute ineffective or inefficient").  A state would be deprived of the safe harbor any time a litigant filed a last-minute suit challenging the results.

The bottom line is that Congress finally adjudicated that Georgia did not appoint Defendants as Electors in 2020.  As a result, Defendants, as a matter of fact and law, were not Electors that year.

## II.    The federal-officer removal statute does not apply to Electors.

But even if Defendants were Electors (they're clearly not), they still couldn't remove their cases to federal court under 28 U.S.C. § 1442(a)(1).  Section 1442(a)(1) allows removal to federal court of a case against "any officer . . . of the United States . . . for any act under color of such office . . . ."  28 U.S.C. § 1442(a)(1).  That said, Electors are not "officers . . . of the United States."[13]  The text

---

[13] Defendants argue Congressmen are officers under section 1442(a)(1), and they are similar to Congressmen.  They offer decisions from our sister circuits allowing Congressmen to remove cases under section 1442(a)(1).  *See, e.g., Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995);

of section 1442(a)(1), the text and structure of the Constitution, and Supreme Court precedent all show this to be the case.

We begin with the text of section 1442(a)(1). When we interpret the meaning of a statutory term, "the ordinary meaning usually controls." *Meadows*, 88 F.4th at 1338. Here, the Dictionary Act gives us an ordinary meaning for "officer." *See United States v. Pate*, 84 F.4th 1196, 1201 (11th Cir. 2023) (compiling dictionary definitions of "officer"). It states that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . 'officer' includes any person authorized by law to perform the duties of the office." 1 U.S.C. § 1. *Black's Law Dictionary* further defines "officer" as "[s]omeone who holds an office of trust, authority, or command." *Officer*, Black's Law Dictionary (12th ed. 2024). And the *Oxford English Dictionary* defines "officer" as "[a] person who holds a particular office, post, or place" or "[a] person who

---

*Williams v. Brooks*, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988). Opinions from our sister circuits can, of course, be persuasive. *See Doe v. Drummond Co.*, 782 F.3d 576, 592 (11th Cir. 2015). But most respectfully, I am not persuaded that Congressmen are officers under the statute for the same reasons I describe below for Electors. The Constitution expressly bars current Congressmen from "holding any Office under the United States." U.S. Const. art. I, § 6, cl. 2. The Fourteenth Amendment distinguishes Congressmen from those who "hold any office, civil or military, under the United States." *Id*. amend. XIV, § 3. And Congressmen do not receive commissions from the President, are not appointed by the President, and represent state constituencies rather than the whole United States. *See generally id*. art. I.

24                     ROSENBAUM, J., Concurring                     23-13360

holds a public, civil, or ecclesiastical office or appointment . . . ."
*Officer*, Oxford English Dictionary, https://www.oed.com/diction-
ary/officer_n?tab=meaning_and_use#33857311
[https://perma.cc/F38U-S6YM] (last visited Oct. 22, 2024).  Based
on these definitions, we can presume an "officer of the United
States" must at the least hold an "office under the United States."

Moving to the Constitution, at least three aspects of the
Constitution show that the ordinary meaning of "officer" cannot
encompass Electors.

*First*, the Constitution expressly bars any "person holding an
office of trust or profit under the United States" from serving as an
Elector.  U.S. CONST. art. II, § 1, cl. 2.  As I've noted, Federalist No.
68 explains that the Framers barred officers of the United States
who report to the President from serving as Electors out of anti-
corruption concerns—because they "might be suspected of too
great devotion to the President in office."

*Second*, the Fourteenth Amendment distinguishes Electors
from officers of the United States.  Section 3 bars certain offenders
from either serving as an "elector of President and Vice-President
*or* hold[ing] any office . . . under the United States."  *Id.* amend. XIV
§ 3 (emphasis added).  The disjunctive reflects that a presidential
Elector is not a "holder [of] any office . . . under the United States."
If presidential Electors were, there would be no reason to bar of-
fenders from serving as Electors *or* United States officers because
simply barring offenders from serving as United States officers
would accomplish the same goal.

23-13360                ROSENBAUM, J., Concurring                25

*Third*, under the Constitution, Electors don't share three major requirements of almost all officers of the United States. First, the President does not commission Electors, though the Constitution requires the President to commission nearly all officers of the United States.[14] *Id.* art. II, § 3. Instead, Electors receive confirmation of their appointment from State authorities under the requirements of state law. In Georgia, they receive certificates of election from the Governor. *See* GA. CODE ANN. § 21-2-502(e) (2024). The President enjoys no role in the process—and for good reason—to avoid any possibility that the President might try to refuse to give opposing party Electors their commissions.

Second, Electors are not appointed like officers of the United States. Except for the elected President and Vice President, "officers of the United States" are appointed by default by the President with the advice and consent of the Senate. U.S. CONST. art. II, § 2, cl. 2. By law, Congress may also provide for the appointment of inferior officers by "the President alone, in the courts of law or in the heads of departments." *Id.* This, as is clear by now, is not the case for Electors, whom state authorities appoint. And for obvious reasons, neither the President nor his subordinates can be entrusted with appointing Electors when he is up for reelection.

---

[14] The exceptions are the President and Vice President. They receive a commission equivalent from Congress, identifying who the new president and vice president will be. AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 575–76 n.14 (2012).

26                     Rosenbaum, J., Concurring                     23-13360

Third, Electors do not perform functions on behalf of the United States as a whole. Executive officers execute federal laws on behalf of the whole United States. The Attorney General enforces the laws of the United States. The Secretary of the Treasury manages the nation's finances. And the Secretary of Defense provides for the entire country's defense. By contrast, Electors serve the interests of only a single state. States appoint them to vote as representatives of that state, not the federal government.

So it's no wonder that the Supreme Court has repeatedly said that Electors are not officers of the United States. *See Fitzgerald v. Green*, 134 U.S. 377, 379 (1890) ("Although the electors are appointed and act under and pursuant to the constitution of the United States, they are no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the states when acting as electors of representatives in congress."); *McPherson*, 146 U.S. at 35 (1892) (quoting *Green*, 134 U.S. at 379); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) ("While presidential electors are not officers or agents of the federal government . . . they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States."); *Ray v. Blair*, 343 U.S. 214, 224 (1952) ("The presidential electors exercise a federal function in balloting for President and Vice-President but they are not federal officers or agents any more than the state elector who votes for congressmen."); *Oregon v. Mitchell*, 400 U.S. 112, 211 n.89 (1970) (Harlan, J., concurring in part and dissenting in part)

23-13360          ROSENBAUM, J., Concurring                    27

("[P]residential electors act by authority of the States and are not federal officials.").

The Court has recognized that states exercise so much power over Electors that they can even "penalize an elector for . . . voting for someone other than the presidential candidate who won his State's popular vote." *Chiafalo*, 591 U.S. at 581. State governments cannot control the functions of any federal officer in the way that they so wholly control those of Electors. *Cf. McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 329-330 (1819) (taking issue with state governments controlling federal functions).

In sum, with section 1442(a)(1), Congress chose to give officers of the United States the privilege of federal court. But with that decision, as is its prerogative, Congress excluded Electors. Electors simply are not officers of the United States.

## III.   Conclusion

For removal to federal court, section 1442(a)(1) requires one to be a federal officer. Defendants are triply not. They are not currently officers. They are not Georgia presidential Electors for the 2020 election. And even if they were, presidential Electors are not federal officers. For these reasons, I concur in the Majority Opinion's affirmance of the district court's order denying removal.

23-13360                GRANT, J., Concurring                1

GRANT, Circuit Judge, Concurring:

Under *Georgia v. Meadows*, the defendants here are not entitled to remove their state criminal prosecutions to federal court because they are not currently federal officers. *See* 88 F.4th 1331, 1338–43 (11th Cir. 2023). I therefore concur with the majority opinion in full. I write separately, however, to express my opinion that *Meadows* was, and is, incorrect.

The *Meadows* opinion largely relies on *United States v. Pate*, in which this Court held en banc that the term "officer" includes only current, and not former, officers. 84 F.4th 1196, 1201 (11th Cir. 2023) (en banc). But as I explained in my *Pate* dissent, that conclusion was wrong on several fronts. Neither dictionary definitions nor the fuller context of the statute there demand the reading endorsed by the majority, whose "approach skips some interpretive tools and overextends others." *Id.* at 1213 (Grant, J., dissenting). The same is true here—and then some.

*First*, "according to the Supreme Court itself, the term 'employees' on its own lacks a 'temporal qualifier such as would make plain' that it refers only to current employees; so too for officers." *Id.* (alteration adopted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Even so, the *Pate* majority, and *Meadows* along with it, relies on dictionary definitions to decide that the "ordinary meaning" of the term *does* have a temporal element. *Id.* at 1201 (majority opinion); *see Meadows*, 88 F.4th at 1338. And it does so by relying not on the substantive definitions of the word "officer," but on the verb tenses within those definitions. *Pate*, 84 F.4th at 1201.

2                          GRANT, J., Concurring                    23-13360

This sort of "[h]ypertechnical interpretation can obscure a text's
true meaning," and I believe it does so here. *Id.* at 1217 (Grant, J.,
dissenting).

      *Second*, just like the statute at issue in *Pate*, this one "inher-
ently looks backward in time," focusing not on the current employ-
ment status of the federal officer, but on that person's status at the
time of the acts giving rise to the current lawsuit. *Id.* at 1214; *see* 28
U.S.C. § 1442(a)(1).  Both statutes center on "the time of the inci-
dents" and are designed to provide a federal forum for claims about
acts taken while serving as a federal officer, regardless of when
those claims are brought.  *Mesa v. California*, 489 U.S. 121, 123
(1989).

      *Third*, both *Pate* and *Meadows* introduce an "unsustainable
illogic" to the statutes they interpret because each one applies not
only to officers, but also to those who were "assisting" or "acting
under" federal officers.  *Pate*, 84 F.4th at 1214 (Grant, J., dissenting);
*see* 18 U.S.C. § 1114(a); 28 U.S.C. § 1442(a)(1).  As I explained in my
*Pate* dissent (and as the majority there very nearly conceded, term-
ing this problem a "loose interpretive end"), it makes no sense that
"people who assisted former federal officers would be protected,
but the former officers themselves would not be." *Pate*, 84 F.4th at
1214 (Grant, J., dissenting); *id.* at 1205 n.3 (majority opinion).  The
*Meadows* opinion, for its part, does not address this oddity.[1]  Either

---

[1] Meadows has since suggested that the panel's opinion would only apply the
"acting under" provision to those who are *currently* acting under a federal of-
ficer, "practically eliminat[ing]" removal for this category of people.

way, the "assisting" and "acting under" provisions in the two statutes counsel against excluding former officers.

*Fourth*, both *Pate* and *Meadows* lean heavily on the use of the word "former" in other statutes, but the comparisons do not hold up. In neither case were the comparison statutes passed at the same time or originally located in the same part of the Code. *See Pate*, 84 F.4th at 1217 (Grant, J., dissenting); *Meadows*, 88 F.4th at 1340. Nor does either opinion properly account for why comparison statutes specifically included former employees—reasons that do not exist in the statutes *Pate* and *Meadows* interpret. *See Pate*, 84 F.4th at 1215–16 (Grant, J., dissenting); *Meadows*, 88 F.4th at 1340. And in any event, as the Supreme Court pointed out in *Robinson*, "that other statutes have been more specific in their coverage of 'employees' and 'former employees' proves only that Congress *can* use the unqualified term 'employees' to refer only to current employees, not that it did so in this particular statute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341–42 (1997) (citations omitted).

These considerations alone, at least in my view, are enough to counsel a reading that includes former officers in both *Pate* and *Meadows*. But for *Meadows* (and this case), we have even more. To start, the Supreme Court has instructed that the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), "must be liberally construed." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (quotation omitted). Excluding former officers from its coverage is just the sort of "narrow, grudging interpretation" that the Supreme Court has rejected. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

What's more, the Supreme Court's conclusion that executive decisionmaking could be "distorted by the threat of future litigation" is in serious tension with the *Meadows* panel's conclusion that the purpose of the federal-officer removal statute is limited to "[s]hielding officers performing current duties." *Trump v. United States*, 144 S. Ct. 2312, 2332 (2024); *Meadows*, 88 F.4th at 1342. Though *Trump* addresses neither immunity for federal officers nor the removal statute, its observation about the distortive effect of future litigation offers additional support for adhering to that commonsense justification here.

The same goes for the assertion that limiting the statute's coverage to current officers better protects state criminal proceedings; it seems to me that the terms of the statute demand a federal forum for both current and former federal officials who otherwise qualify. *See* 28 U.S.C. § 1442(a)(1); *Meadows*, 88 F.4th at 1338. As the Supreme Court has repeated time and again, the broader context shows that the federal-officer removal statute guarantees defendants the ability to test their federal defenses in federal court. *See Willingham*, 395 U.S. at 407; *Watson*, 551 U.S. at 150–51.

\*    \*    \*

Rather than declaring that Mr. Shafer is ineligible for federal-officer removal because he is no longer (even arguably) a federal officer, I think the better course would be to consider the merits of the district court's thoughtful conclusion that he was not *ever* a federal officer. The same is true for the other defendants. But because our Court's precedent demands otherwise, I respectfully concur.

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13360

Non-Argument Calendar

_____

STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

DAVID JAMES SHAFER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03720-SCJ

_____

2                    Opinion of the Court                    23-13360

_____

No. 23-13361

Non-Argument Calendar

_____

STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

SHAWN MICAH TRESHER STILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03792-SCJ

_____

_____

No. 23-13362

Non-Argument Calendar

_____

23-13360            Opinion of the Court                    3

STATE OF GEORGIA,

                                        Plaintiff-Appellee,

*versus*

CATHLEEN ALSTON LATHAM,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03803-SCJ

_____

The opinion has been changed as follows:

    On page 4, "Governor" has been changed to "governor."

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 24, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-13360-DD   ; 23-13361 -DD   ; 23-13362 -DD
Case Style:  State of Georgia v. David Shafer
District Court Docket No:  1:23-cv-03720-SCJ

<u>Opinion Issued</u>
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

<u>Petitions for Rehearing</u>
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing <u>must</u> include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** <u>See</u> 11th Cir. R. 35-5(k) and 40-1.

<u>Costs</u>
Costs are taxed against Appellant(s) / Petitioner(s).

<u>Bill of Costs</u>
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at <u>www.ca11.uscourts.gov</u>. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

<u>Attorney's Fees</u>
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

<u>Appointed Counsel</u>
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
|---|---|---|---|
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion